HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JANE DOE, JOHN DOE, and H.S., by and
through his guardian, individually and on behalf
of all others similarly situated, and JANE DOE
2, JOHN DOE 2, N.B,, JANE DOE 3, and
JANE DOE 4, individually,

                                    Plaintiffs,

        v.

BHC FAIRFAX HOSPITAL, INC. d/b/a
FAIRFAX BEHAVIORAL HEALTH,

                                    Defendant.

No. 2:19-cv-00635-TSZ

**SECOND AMENDED CLASS ACTION
COMPLAINT**

[Leave to Amend Granted on July 1, 2020,
Dkt. No. 61]

**<u>DEMAND FOR JURY TRIAL</u>**



**TABLE OF CONTENTS**

Page

I.   INTRODUCTION .................................................................................................1

II.  THE PARTIES.....................................................................................................2

III. JURISDICTION AND VENUE ...........................................................................4

IV.  FACTS .................................................................................................................4

     A.   Plaintiff Jane Doe was traumatized by baseless, invasive strip- and cavity-searches. ...................................................................................4

     B.   Plaintiff John Doe was humiliated by baseless, invasive strip- and cavity-searches. ...................................................................................6

     C.   Plaintiff H.S. was traumatized by baseless, invasive strip- and cavity-searches. ...................................................................................8

     D.   Plaintiff Jane Doe 2 was traumatized by baseless, invasive strip and cavity searches. ...................................................................................9

     E.   Plaintiff John Doe 2 was traumatized and humiliated by baseless, invasive strip and cavity searches. ............................................11

     F.   Plaintiff N.B. was violated by a baseless and invasive strip search. ...................13

     G.   Plaintiff Jane Doe 3 was traumatized by baseless, invasive strip- and cavity-searches. ...................................................................................14

     H.   Plaintiff Jane Doe 4 was traumatized and humiliated by baseless, invasive strip- and cavity-searches. ............................................16

     I.   Fairfax Hospital staff practice indiscriminate cavity searching, strip searching, and video recording of patients in various states of undress. ...............17

     J.   Fairfax Hospital's invasive search and video monitoring practices are motivated by discriminatory animus. ...............................................19

     K.   Fairfax Hospital's strip search and video monitoring practices have a disparate impact on survivors of trauma, including Plaintiffs. .............................22

V.   CLASS ALLEGATIONS ...................................................................................23

VI.  CAUSES OF ACTION .....................................................................................25

COUNT I  TITLE III OF THE AMERICANS WITH DISABILITIES ACT ..............................25

COUNT II  ABUSE OF VULNERABLE ADULTS ...............................................................27

COUNT III  NEGLIGENCE ...............................................................................................28

COUNT IV  INVASION OF PRIVACY ...............................................................................29



1

COUNT V  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ...............................29

COUNT VI  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS .................................30

PRAYER FOR RELIEF ........................................................................................................32

JURY TRIAL DEMANDED ..................................................................................................33

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



All plaintiffs bring this action individually, and plaintiffs Jane Doe, John Doe, and H.S. bring a class action on behalf of all persons who were admitted to BHC Fairfax Hospital, Inc. d/b/a Fairfax Behavioral Health ("Fairfax") between April 30, 2016, and the date of class certification.

## I.   INTRODUCTION

1.      It is a violation of the standard of care for a psychiatric hospital to conduct strip searches in the absence of individualized assessments that a patient possesses drugs or weapons.

2.      It is a violation of the standard of care for a psychiatric hospital to use video monitoring in the room where strip searches are conducted while patients are undressed.

3.      All inpatient psychiatric patients are entitled to care, treatment, and therapies to maintain and improve their health and well-being. Most importantly for individuals with chronic mental illness, inpatient psychiatric patients are entitled to dignity, respect, compassion, and competent care.

4.      Fairfax has a blanket policy requiring all adult and teen patients to remove clothing and practice of randomly strip searching adult and teen patients indiscriminately. The process is video recorded by Fairfax in violation of patient's privacy.

5.      No psychiatric hospital in Washington State other than Fairfax permits its staff to arbitrarily conduct strip searches or cavity searches.

6.      No psychiatric hospital in Washington State other than Fairfax makes and keeps video recordings of patients in various states of undress, including areas where strip searches and cavity searches are conducted.

7.      It is an unfair practice for a person in the operation of a place of public accommodation to fail or refuse to make reasonable accommodation to the known physical, sensory, or mental limitations of a person with a disability. Fairfax's practice of arbitrarily conducting strip-and-cavity searches of adult and teen patients suffering from mental illness and use of invasive video monitoring is substantially motivated by discriminatory animus toward people with serious mental health conditions requiring inpatient treatment and restricts those patients from receiving the treatment they present for and are entitled to receive.

SECOND AMENDED CLASS ACTION COMPLAINT - 1
Case No. 2:19-cv-00635-TSZ
003229-11/1271691 V1



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

8.      Fairfax's blanket policy requiring all adult and teen patients to remove clothing and practice of indiscriminately strip searching adult and teen patients and excessive video recording violates the Americans with Disabilities Act, the Washington Law Against Discrimination, Vulnerable Adult statute, and invades the patients' privacy causing severe emotional distress, physical harm, and economic harm to Plaintiffs and the Class, for which Fairfax must be held responsible.

## II.      THE PARTIES

9.      Plaintiff Jane Doe is a resident of Oak Harbor, Washington and a citizen of the United States.

10.     Plaintiff John Doe is a resident of Freeland, Washington and a citizen of the United States.

11.     Plaintiff H.S. is a resident of Snohomish, Washington and a lawful permanent resident of the United States.

12.     Plaintiff Jane Doe 2, is a resident of Tacoma, Washington and a citizen of the United States.

13.     Plaintiff John Doe 2 is a resident of Seattle, Washington and a citizen of the United States.

14.     Plaintiff N.B. is a resident of Seattle, Washington and a citizen of the United States.

15.     Plaintiff Jane Doe 3 is a resident of Selah, Washington and a citizen of the United States.

16.     Plaintiff Jane Doe 4 is a resident of Auburn, Washington and a citizen of the United States.

17.     Defendant BHC Fairfax Hospital, Inc. d/b/a Fairfax Behavioral Health ("Fairfax") is the largest private provider of inpatient psychiatric services in the state of Washington.



Fairfax's principal place of business is in Kirkland, Washington. Fairfax is a licensed psychiatric hospital that cares for outpatient and inpatients, whether admitted voluntarily or involuntarily.[1]

18.     Fairfax operates a 157-bed, standalone psychiatric hospital, located in Kirkland, Washington; composed of six units providing specialized treatment for mental health and co-occurring disorders (concurrent mental illness and substance abuse issues), as well as detoxification services for both adults and teens (ages 13-17). Fairfax also operates a 30-bed adult general psychiatric unit, located in Everett, Washington on the seventh floor of the Providence Medical Center's Pacific campus as well as, a 34-bed unit on the campus of Evergreen Health Monroe.

19.     Fairfax offers primarily inpatient care. For example, in 2016, Fairfax received over 98% of its revenue from inpatient admissions.[2] And in 2017, Fairfax received 100% of its revenue from inpatient admissions.[3]

20.     At all times material hereto, Fairfax employed nurses and other health care providers, whose names are presently unknown, to care for Plaintiffs and Class members. All acts and failures to act by nurses and other health care provides at Fairfax were done within the scope of their employment by Fairfax. At all times material hereto, Fairfax is vicariously liable for the acts/omissions committed by the employees and/or agents working for or on behalf of Fairfax.

21.     Upon information and belief, Plaintiffs further allege that there may be other nurses, healthcare providers, agents or employees of Fairfax, or other persons or entities whose tortious acts or omissions further contributed to the injuries and damages suffered by Plaintiffs, but whose true and correct identity is not now known to Plaintiffs. Plaintiffs will seek leave of the Court to amend this Complaint to add the names of these persons or entities when their identities become known.

---

[1] WASHINGTON STATE DEPARTMENT OF HEALTH, Facility Search, https://fortress.wa.gov/doh/facilitysearch/.

[2] *BHC Fairfax Hospital Inc. Year End Report to the Department of Health*, Office of Hospital and Patient Data, https://www.doh.wa.gov/Portals/1/.../2300/HospPatientData/YearEnd/YE904-2016.xlsx.

[3] *BHC Fairfax Hospital Inc. Year End Report to the Department of Health*, Office of Hospital and Patient Data, https://www.doh.wa.gov/DataandStatisticalReports/HealthcareinWashington/HospitalandPatientData/HospitalFinancialData/YearEndReports/2017HospitalYearEndReports.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1

### III.   JURISDICTION AND VENUE

2     22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because

3 this action arises under the laws of the United States. This Court also has jurisdiction pursuant to

4 the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists

5 of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and

6 interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state

7 law claims pursuant to 28 U.S.C. § 1367.

8     23.     Venue is proper in this District under 28 U.S.C. § 1391 (a)-(d) because, *inter alia*,

9 substantial parts of the events or omissions giving rise to the claim occurred in the District and/or

10 a substantial part of property that is the subject of the action is situated in the District.

11

### IV.   FACTS

12 **A.     Plaintiff Jane Doe was traumatized by baseless, invasive strip- and cavity-searches.**

13     24.     On March 2, 2018, Jane Doe presented for inpatient admission to Fairfax Hospital

14 in Kirkland, Washington, a psychiatric hospital, for treatment for her mental illness. At intake,

15 Fairfax staff ordered her to completely undress for a search. Ms. Doe has a history of sexual

16 abuse and explained that to the staff member. Nevertheless, she was again ordered to completely

17 undress. Ms. Doe was not given a gown or towel to cover up during the search.

18     25.     The staff member watched Ms. Doe undress and left the door open where other

19 staff members could see her in various stages of undress—eventually, completely naked except

20 for a small pair of G-string underwear.

21     26.     Video cameras installed by Fairfax were present in the hallway, the holding area

22 outside the bathroom, and the room where the strip search was conducted. The cameras recorded

23 Ms. Doe in a state of undress and during the events that followed. The footage, however, was

24 destroyed by Fairfax after Ms. Doe began submitting grievances in connection with this search.

25     27.     During the search, Ms. Doe started shaking and crying. The staff member

26 demanded that Ms. Doe pull her underwear down to her knees, bend over, squat down, and

27 spread her vagina and behind for a cavity search. The staff member made this demand without

28



1   documenting the need for an intrusive strip search, or obtaining a clinical determination that one

2   was necessary from a psychiatric professional.

3          28.     In response, Ms. Doe began screaming and crying and curled up in a ball on the

4   floor. The staff member then threatened to get a male worker to restrain Ms. Doe—who at this

5   point was still undressed with her underpants around her knees—in order to conduct the cavity

6   search.

7          29.     Another female staff member intervened and managed to calm Ms. Doe down a

8   little. The second staff member suggested that Ms. Doe spread her cheeks and walk instead of

9   doing a cavity search. Ms. Doe complied to avoid any potential interaction with male Fairfax

10  staff.

11         30.     At no point during this humiliating process did the nurse or anyone at Fairfax

12  attempt to evaluate Ms. Doe's current safety risk to herself or others. No one asked her any

13  questions about her current thoughts with regard to self-injury or whether she was carrying

14  anything she might use to hurt herself or others.

15         31.     At no time during this entire episode did Ms. Doe state, imply, or otherwise

16  indicate that she had any current thoughts or intention to hurt herself or anyone else. At no time

17  during this entire period did Ms. Doe act in a manner that would have led a reasonable health

18  care professional to believe that there was an immediate risk of harm to Ms. Doe or to others.

19         32.     Although mental health professionals were available at Fairfax to evaluate her at

20  intake, no one evaluated Ms. Doe's current safety risk by asking her any questions about her

21  current thoughts regarding self-injury or whether she was carrying anything that she might use to

22  hurt herself before demanding a strip search and threatening to get a male worker to conduct the

23  invasive search.

24         33.     The next day, Ms. Doe tried to find someone to discuss what happened during the

25  invasive strip search but was told there was no one for her to talk to because it was a weekend.

26         34.     Finally, someone told her to fill out a grievance form which she did. Over the next

27  five days, she filled out five additional grievance forms. Ms. Doe asked to see the policy on

28  searches but Fairfax staff refused to show it to her and Ms. Doe was told to "get over it."

35.     Video footage of this incident was destroyed after Ms. Doe began filing grievances in connection with it.

36.     Ms. Doe's emotional/mental health continued to decline during her stay at Fairfax. This decline is directly attributable to the humiliating invasion of privacy and bodily autonomy perpetrated by Fairfax and its staff.

37.     Fairfax failed to provide safe, non-abusive, treatment with dignity and privacy. As a result of the March 2, 2018 strip search, Ms. Doe experienced severe trauma, nightmares, hopelessness, and greatly increased urges to harm and kill herself. In fact, Ms. Doe attempted suicide after her release from Fairfax.

38.     After leaving Fairfax in March 2018, Ms. Doe has been hospitalized three times for inpatient mental health treatment. These hospitalizations were a direct result of the Fairfax's pattern and practice of conducting strip searches on incoming patients without first performing an individualized risk assessment and video recording.

**B.      Plaintiff John Doe was humiliated by baseless, invasive strip- and cavity-searches.**

39.     On December 24, 2018, John Doe voluntarily taken by ambulance from Whidbey General Hospital to Fairfax Kirkland, Washington, for treatment for his mental illness. Mr. Doe was only wearing a hospital gown when he arrived at Fairfax. All of his clothes and personal belongings were put in sealed bags.  Once he arrived, Mr. Doe's clothes and personal belongings were given to a Fairfax staff member and locked up for the duration of his stay. Mr. Doe was then taken to the locked ward where he was escorted to an open bathroom area visible to all the other patients.

40.     Fairfax staff ordered Mr. Doe to remove the hospital gown. He was then instructed to bend over and spread his buttocks apart and move his genitals from side to side, Fairfax staff made this demand without documenting the need for an intrusive strip search, or obtaining a clinical determination that one was necessary from a psychiatric professional. Mr. Doe was not given his hospital gown back. Nor was he given a gown or a towel to cover up during the search.

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

41.     Video cameras installed by Fairfax were present in the hallway, the holding area outside the bathroom, and the room where the strip search was conducted. The cameras recorded Mr. Doe in a state of undress during the strip search. After the search, Mr. Doe waited naked in this area for approximately 20-30 minutes for Fairfax staff to bring a gown that he was to wear for his entire stay.

42.     At no point during this humiliating process did the nurse or anyone at Fairfax attempt to evaluate Mr. Doe's current safety risk to himself or others. No one asked him any questions about his current thoughts with regard to self-injury or whether he was carrying anything he might use to hurt himself or others.

43.     At no time during this entire episode did Mr. Doe state, imply, or otherwise indicate that he had any current thoughts or intention to hurt himself or anyone else. At no time during this entire period did he act in a manner that would have led a reasonable health care professional to believe that there was an immediate risk of harm to himself or to others.

44.     Although mental health professionals were available at Fairfax to evaluate him at intake, no one evaluated Mr. Doe's current safety risk by asking him any questions about his current thoughts regarding self-injury or whether he was carrying anything that he might use to hurt him before demanding a strip search.

45.     Mr. Doe's emotional and mental health continued to decline during his stay at Fairfax. He laid in his bed crying for days and was not seen by a psychiatrist until three days after his admission. This decline is directly attributable to the humiliating invasion of privacy and bodily autonomy perpetrated by Fairfax and its staff.  And once the psychiatrist did finally meet with Mr. Doe, he advised Mr. Doe that he would not be treating him or prescribing any medication management because Mr. Doe would be leaving soon and he did not want to invest any time in treating him and that he could seek treatment with an outside provider.

46.     Fairfax failed to provide safe, non-abusive, treatment with dignity and privacy. As a result of the December 24, 2018 strip search, Mr. Doe experienced severe trauma, hopelessness, and greatly increased urges to harm and kill himself. In fact, Mr. Doe attempted suicide after his release from Fairfax.



**C.      Plaintiff H.S. was traumatized by baseless, invasive strip- and cavity-searches.**

47.      In May of 2017, 14 year-old H.S. was voluntarily taken by ambulance from Providence Hospital to Fairfax in Kirkland, Washington, for treatment for his mental illness. Once he arrived, a Fairfax staff member grabbed him and escorted him to the teen ward. Although H.S. is blind after being shot in the face as a toddler, the staff member barked at H.S., "Don't look at anyone, walk straight!" H.S. responded by telling Fairfax staff that he is totally blind.

48.      H.S. was then handed off to another Fairfax staff member who ordered him to take off all of his clothes. H.S. refused and told Fairfax staff he was not comfortable doing that. The Fairfax staff member responded by threatening, "You're going to or we will do it for you." H.S. took his shirt and shorts off. Fairfax staff ordered him to also remove his underwear. H.S. could feel one of the staff members moving towards him and feared that he was going to be tazed. H.S. was again ordered to take off his underwear. He complied. H.S. was then told to bend over and spread his buttocks apart. Next, he was told to move his genitals from side to side. The staff member made these demands without documenting the need for an intrusive strip search, or obtaining a clinical determination that one was necessary from a psychiatric professional. H.S. was not given a gown or towel to cover up during the search. H.S.'s guardians were not informed of the strip search nor were they asked for consent to strip-search their 14 year-old child.

49.      Video cameras installed by Fairfax were present in the hallway, the holding area outside the bathroom, and the room where the strip search was conducted. Cameras were also present throughout the area of Fairfax where H.S. was housed during his stay including patient bedrooms and bathrooms. The cameras recorded H.S. in a state of undress.  H.S. waited naked in the area where he was strip-searched with the door wide open for approximately 5 minutes waiting for Fairfax staff to bring him clothing to put on.

50.      At no point during this humiliating process did the nurse or anyone at Fairfax attempt to evaluate H.S's current safety risk to himself or others. No one asked him any questions about his current thoughts with regard to self-injury or whether he was carrying anything he might use to hurt himself or others.



51.     At no time during this entire episode did H.S. state, imply, or otherwise indicate that he had any current thoughts or intention to hurt himself or anyone else. At no time during this entire period did he act in a manner that would have led a reasonable health care professional to believe that there was an immediate risk of harm to himself or to others.

52.     Although mental health professionals were available at Fairfax to evaluate him at intake, no one evaluated H.S.'s current safety risk by asking him any questions about his current thoughts regarding self-injury or whether he was carrying anything that he might use to hurt him before demanding a strip search.

53.     H.S.'s emotional/mental health continued to decline during his stay at Fairfax. This decline is directly attributable to the humiliating invasion of privacy and bodily autonomy perpetrated by Fairfax and its staff. H.S.'s guardians contacted Fairfax multiple times during his stay and were told that he would have to remain there for five days before he could be released. He remained at Fairfax for two more days until his parents pulled him out.

54.     Fairfax failed to provide safe, non-abusive, treatment with dignity and privacy. As a result of the May 2017 strip search, H.S. experienced severe trauma, hopelessness, and greatly increased urges to harm and kill himself. In fact, H.S. attempted suicide after his release from Fairfax.

**D.     Plaintiff Jane Doe 2 was traumatized by baseless, invasive strip and cavity searches.**

55.     On May 18, 2019, Jane Doe 2 was voluntarily admitted to Fairfax Hospital in Monroe, Washington, a psychiatric hospital, for inpatient treatment for her mental illness. She was transferred by ambulance from St. Clare Hospital in Lakewood, Washington. Ms. Doe 2 was wearing a hospital gown when she arrived at Fairfax. Her personal belongings and a bag with her personal belongings were handed over to Fairfax staff when she arrived.

56.     Ms. Doe 2 was then taken to a seclusion room where Fairfax staff ordered her to completely undress for a search. Ms. Doe 2 has a history of sexual trauma and explained that to the staff member. Nevertheless, Fairfax staff again ordered Ms. Doe 2 to completely undress, and spread her legs and her butt cheeks so they could observe if something came out. Fairfax staff

1   made this demand without documenting the need for an intrusive strip search, or obtaining a

2   clinical determination that one was necessary from a psychiatric professional.

3          57.     The Fairfax staff member left the door open where others could see Ms. Doe 2 in

4   various stages of undress. Ms. Doe 2 asked Fairfax staff to close the door, they refused. Ms. Doe

5   2 refused to become totally naked during the search. Fairfax staff told Ms. Doe 2 to just do it and

6   get it over with and it will be over sooner. A Fairfax staff member wearing gloves touched Ms.

7   Doe 2 on her back and her bottom during the search. Ms. Doe 2 was in shock and felt numb as

8   this was happening.

9          58.     Video cameras installed by Fairfax were present in the hallway, the area outside

10  the seclusion room, and the room where the strip search was conducted. The cameras recorded

11  Ms. Doe 2 in a state of undress and during the strip and cavity search.

12         59.     At no point during this humiliating process did the nurse or anyone at Fairfax

13  attempt to evaluate Ms. Doe 2's current safety risk to herself or others. No one asked her any

14  questions about her current thoughts with regard to self-injury or whether she was carrying

15  anything she might use to hurt herself or others.

16         60.     At no time during this entire episode did Ms. Doe 2 state, imply, or otherwise

17  indicate that she had any current thoughts or intention to hurt herself or anyone else. At no time

18  during this entire period did Ms. Doe 2 act in a manner that would have led a reasonable health

19  care professional to believe that there was an immediate risk of harm to Ms. Doe 2 or to others.

20         61.     Although mental health professionals were available at Fairfax to evaluate her at

21  intake, no one evaluated Ms. Doe 2's current safety risk by asking her any questions about her

22  current thoughts regarding self-injury or whether she was carrying anything that she might use to

23  hurt herself before demanding a strip search.

24         62.     Ms. Doe 2's emotional/mental health continued to decline during her stay at

25  Fairfax. This decline is directly attributable to the humiliating invasion of privacy and bodily

26  autonomy perpetrated by Fairfax and its staff.

27         63.     When Ms. Doe 2's daughter visited her later that day, Ms. Doe 2 told her that

28  Fairfax staff had strip searched her in a seclusion room with a bed that had straps on it and that

1    they had taken her walker away from her. Ms. Doe 2's daughter observed that her mother was

2    more withdrawn than usual, like "she wanted to crawl inside herself." Ms. Doe 2 told her

3    daughter that she did not feel safe and wanted to go home.

4          64.    When Ms. Doe 2's daughter visited the next day, she observed that Ms. Doe 2

5    was crying and that she appeared afraid. Ms. Doe 2 told her daughter that she was not allowed to

6    use her walker at Fairfax and had fallen and hurt herself. She told her daughter again that she

7    wanted to leave Fairfax. Ms. Doe 2's daughter asked to speak with a Fairfax staff member who

8    was familiar with Ms. Doe 2's complaints. The Fairfax staff member told Ms. Doe 2's daughter

9    that it was standard protocol for patients to be strip searched at Fairfax. Next, Ms. Doe 2's

10    daughter spoke with the charge nurse who informed her that Fairfax determined Ms. Doe 2 did

11    not require a walker while she was at Fairfax and that her primary care physician could not

12    dictate her medical care while she was there. The charge nurse told Ms. Doe 2's daughter that

13    Ms. Doe 2 did not belong there and should not have been sent to Fairfax if she was not

14    ambulatory.

15          65.    Fairfax failed to provide safe, non-abusive, treatment with dignity and privacy. As

16    a result of the May 18, 2019 strip search, Ms. Doe 2 experienced severe trauma, nightmares,

17    hopelessness, and greatly increased urges to harm and kill herself.

18          66.    After leaving Fairfax on May 20, 2019, Ms. Doe 2 has been hospitalized twice

19    times for inpatient mental health treatment. These hospitalizations were a direct result of the

20    patient search process at Fairfax.

21    **E.**    **Plaintiff John Doe 2 was traumatized and humiliated by baseless, invasive strip and**
           **cavity searches.**

22

23          67.    On March 1, 2019, John Doe 2 was voluntarily admitted to Fairfax Hospital in

    Everett, Washington, for treatment for his mental illness. He was transferred by ambulance from

24    the University of Washington Medical Center in Seattle, Washington. Once he arrived at Fairfax

25    Hospital, Mr. Doe 2's backpack with his personal belongings were given to a Fairfax staff

26    member and locked up for the duration of his stay.

27

28



68.     Mr. Doe 2 was then taken to the locked ward where he was escorted to a room where Fairfax staff conducted a strip and cavity search. Mr. Doe was not given a gown or a towel to cover up during the search. During the search, Fairfax staff instructed Mr. Doe to remove his clothing and bend over and spread his buttocks apart. Fairfax staff made this demand without documenting the need for an intrusive strip search, or obtaining a clinical determination that one was necessary from a psychiatric professional. Fairfax staff touched Mr. Doe 2 on his hip and butt cheeks during the strip and cavity search.

69.     Video cameras installed by Fairfax were present in the hallway and the room where the strip search was conducted. The cameras recorded Mr. Doe 2 in a state of undress during the strip search. Fairfax staff laughed and took pictures of Mr. Doe 2 during the search. Mr. Doe 2 complained to Fairfax staff that they were abusing and threatening him. He tried to run away, but the door to leave the unit was locked. Fairfax staff chased after him and threatened to call the police on him.

70.     At no point during this humiliating process did the nurse or anyone at Fairfax attempt to evaluate Mr. Doe 2's current safety risk to himself or others. No one asked him any questions about his current thoughts with regard to self-injury or whether he was carrying anything he might use to hurt himself or others.

71.     At no time during this entire episode did Mr. Doe 2 state, imply, or otherwise indicate that he had any current thoughts or intention to hurt himself or anyone else. At no time during this entire period did he act in a manner that would have led a reasonable health care professional to believe that there was an immediate risk of harm to himself or to others.

72.     Although mental health professionals were available at Fairfax to evaluate him at intake, no one evaluated Mr. Doe 2's current safety risk by asking him any questions about his current thoughts regarding self-injury or whether he was carrying anything that he might use to hurt him before demanding a strip search.

73.     Mr. Doe 2's emotional and mental health continued to decline during his stay at Fairfax. This decline is directly attributable to the humiliating invasion of privacy and bodily autonomy perpetrated by Fairfax and its staff. Mr. Doe 2 requested he be discharged and was

SECOND AMENDED CLASS ACTION COMPLAINT - 12
Case No. 2:19-cv-00635-TSZ
003229-11/1271691 V1

HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    discharged from Fairfax the next day because he did not feel safe and because the environment at

2    Fairfax was damaging to his mental health.

3         74.    Fairfax failed to provide safe, non-abusive, treatment with dignity and privacy. As

4    a result of the March 1, 20198 strip search, Mr. Doe 2 experienced severe trauma, hopelessness,

5    and greatly increased urges to harm and kill himself.

6         75.    Mr. Doe 2 filed a complaint against Fairfax with the Washington State

7    Department of Health (DOH). DOH conducted an investigation and found cause for corrective

8    action against Fairfax.

9    **F.    Plaintiff N.B. was violated by a baseless and invasive strip search.**

10        76.    On February 22, 2019, N.B was voluntarily admitted to Fairfax Hospital in

11   Kirkland, Washington, for treatment for their mental illness. N.B. was transferred by ambulance

12   from Harborview Medical Center in Seattle, Washington.

13        77.    Upon arrival N.B. was immediately taken to the locked ward where a female

14   Fairfax staff member conducted a strip search. N.B. was not given a gown or a towel to cover up

15   during the search. During the search, Fairfax staff instructed N.B. to take off their shirt, pants,

16   and underwear. Fairfax staff made this demand without documenting the need for an intrusive

17   strip search, or obtaining a clinical determination that one was necessary from a psychiatric

18   professional. N.B. complied and removed all of their clothing and was searched.

19        78.    Video cameras installed by Fairfax were present in the hallway and in the room

20   where the strip search was conducted. The cameras recorded N.B. in a state of undress during the

21   strip search. Cameras were also present throughout the area where N.B. was housed during their

22   stay at Fairfax.

23        79.    At no point during this humiliating process did the nurse or anyone at Fairfax

24   attempt to evaluate N.B.'s current safety risk to themself or others. No one asked N.B. any

25   questions about their current thoughts with regard to self-injury or whether they were carrying

26   anything they might use to hurt themself or others.

27        80.    At no time during this entire episode did N.B. state, imply, or otherwise indicate

28   that they had any current thoughts or intention to hurt themself or anyone else. At no time during

H-B HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

this entire period did they act in a manner that would have led a reasonable health care professional to believe that there was an immediate risk of harm to themself or to others.

81.     Although mental health professionals were available at Fairfax to evaluate N.B. at intake, no one evaluated their current safety risk by asking them any questions about their current thoughts regarding self-injury or whether they were carrying anything that they might use to hurt themself before demanding a strip search.

82.     N.B.'s emotional and mental health continued to decline during their stay at Fairfax. This decline is directly attributable to the humiliating invasion of privacy and bodily autonomy perpetrated by Fairfax and its staff.

83.     Fairfax failed to provide safe, non-abusive, treatment with dignity and privacy. As a result of the February 22, 2019 strip search, N.B. experienced severe trauma, hopelessness, and greatly increased urges to harm and kill themself. The patient search process at Fairfax has deterred N.B. from seeking services in psychiatric hospitals.

**G.     Plaintiff Jane Doe 3 was traumatized by baseless, invasive strip- and cavity-searches.**

84.     On July 16, 2017, Jane Doe 3 was taken by ambulance from Kittitas Valley Healthcare in Ellensburg, Washington to Fairfax Hospital in Kirkland, Washington for inpatient treatment for her mental illness. Her personal belongings and medications were handed over to Fairfax staff when she arrived.

85.     Ms. Doe 3 was then taken to the day room where she spoke to a Fairfax nurse about her history of sexual trauma. The nurse then led Ms. Doe 3 to a room at the end of the hall with only a bed and then ordered her to completely undress for a search. The nurse made this demand without documenting the need for an intrusive strip search, or obtaining a clinical determination that one was necessary from a psychiatric professional. Ms. Doe 3 asked the nurse if she needed to completely undress and the nurse responded, yes. She then asked the nurse if she had to take her underwear off too and the nurse again responded, yes. Ms. Doe 3 reminded the nurse that they had just discussed her history of sexual trauma, and the nurse responded, "I



1   know. But it's protocol." When Ms. Doe 3 told the Fairfax nurse that she did not want to do it,

2   the nurse told her, "It's just a body."

3       86.     Ms. Doe 3 was not given a gown or towel to cover up during the search. She

4   closed her eyes and removed all of her clothing including her underwear. Ms. Doe 3 was laying

5   down on the bed in the room and was holding her shirt in her hand during the search. The Fairfax

6   nurse touched Ms. Doe 3 on her stomach during the search. Ms. Doe 3 was crying and covering

7   her eyes as this was happening. The Fairfax nurse then ordered Ms. Doe 3 to lift up her legs and

8   cough. When Ms. Doe 3 asked the Fairfax nurse why, the nurse responded, "Just cough."

9       87.     Video cameras installed by Fairfax were present in the hallway, the area outside

10  the room, and the room where the strip and cavity searches were conducted. The cameras

11  recorded Ms. Doe 3 in a state of undress and during the strip and cavity searches.

12      88.     At no point during this humiliating process did the nurse or anyone at Fairfax

13  attempt to evaluate Ms. Doe 3's current safety risk to herself or others. No one asked her any

14  questions about her current thoughts with regard to self-injury or whether she was carrying

15  anything she might use to hurt herself or others.

16      89.     At no time during this entire episode did Ms. Doe 3 state, imply, or otherwise

17  indicate that she had any current thoughts or intention to hurt herself or anyone else. At no time

18  during this entire period did Ms. Doe 3 act in a manner that would have led a reasonable health

19  care professional to believe that there was an immediate risk of harm to Ms. Doe 3 or to others.

20      90.     Although mental health professionals were available at Fairfax to evaluate her at

21  intake, no mental health professional evaluated Ms. Doe 3's current safety risk by asking her any

22  questions about her current thoughts regarding self-injury or whether she was carrying anything

23  that she might use to hurt herself before demanding a strip search.

24      91.     Ms. Doe 3's emotional/mental health continued to decline during her stay at

25  Fairfax. This decline is directly attributable to the humiliating invasion of privacy and bodily

26  autonomy perpetrated by Fairfax and its staff.

27

28



92.     Fairfax failed to provide safe, non-abusive, treatment with dignity and privacy. As a result of the July 16, 2017 strip search, Ms. Doe 3 experienced severe trauma, increased weight loss, relationship and trust issues, fear of confined spaces, and hopelessness.

**H.      Plaintiff Jane Doe 4 was traumatized and humiliated by baseless, invasive strip- and cavity-searches.**

93.     On August 30, 2019, Jane Doe 4 was voluntarily admitted to Fairfax Hospital in Kirkland, Washington, a psychiatric hospital, for inpatient treatment for her mental illness. She was transferred by ambulance from Auburn Medical Center. When Jane Doe 4 arrived at Fairfax, her personal belongings were handed over to Fairfax staff.

94.     Ms. Doe 4 was then taken to a room with showers in it where a Fairfax staff member ordered her to go into a bathroom and completely undress for a search. Ms. Doe 4 went into the bathroom to undress and came out wearing just her underwear. The Fairfax member staff again made Ms. Doe 4 go back in the bathroom and take her underwear off. The Fairfax staff member made this demand without documenting the need for an intrusive strip search, or obtaining a clinical determination that one was necessary from a psychiatric professional.

95.     Ms. Doe 4 was not given a gown or towel to cover up during the search. Ms. Doe 4 was completely naked and felt very insecure about her body. Ms. Doe 4 was very concerned that anyone could come in while she was standing there completely naked. The Fairfax staff member ordered Ms. Doe 4 to lift her arms and open her mouth during the strip and cavity searches.

96.     Video cameras installed by Fairfax were present in the hallway and the area outside the room. Ms. Doe 4 does not know if any cameras were present in the room where the strip and cavity searches were conducted. Ms. Doe 4 is concerned that the cameras in the hallway and/or outside recorded her in a state of undress and during the strip and cavity search.

97.     At no point during this humiliating process did the nurse or anyone at Fairfax attempt to evaluate Ms. Doe 4's current safety risk to herself or others. No one asked her any questions about her current thoughts with regard to self-injury or whether she was carrying anything she might use to hurt herself or others.



98.     At no time during this entire episode did Ms. Doe 4 state, imply, or otherwise indicate that she had any current thoughts or intention to hurt herself or anyone else. At no time during this entire period did Ms. Doe 4 act in a manner that would have led a reasonable health care professional to believe that there was an immediate risk of harm to Ms. Doe 4 or to others.

99.     Although mental health professionals were available at Fairfax to evaluate her at intake, no one evaluated Ms. Doe 4's current safety risk by asking her any questions about her current thoughts regarding self-injury or whether she was carrying anything that she might use to hurt herself before demanding a strip search.

100.    Ms. Doe 4's emotional/mental health continued to decline during her stay at Fairfax. This decline is directly attributable to the humiliating invasion of privacy and bodily autonomy perpetrated by Fairfax and its staff.

101.    On September 1, 2019, Ms. Doe 4 woke up feeling like her body was on fire. She asked Fairfax staff to check her heart rate and went unconscious. When Ms. Doe 4 woke up, she asked to be transferred to a hospital. Fairfax staff refused. When Ms. Doe 4 asked to use to phone to call 911 for help, Fairfax staff told her they would remove her phone privileges. Instead, Ms. Doe 4 called her boyfriend and he called 911. Ms. Doe 4 was crying and scared. She requested to leave Fairfax that day. She was discharged on September 2, 2020.

102.    Ms. Doe 4's emotional/mental health has deteriorated extremely since leaving Fairfax. This decline is directly attributable Fairfax's failure to provide safe, non-abusive, treatment with dignity and privacy. As a result of the August 30, 2019 strip search, Ms. Doe 4 experienced severe trauma, nightmares, hopelessness, and has really struggled to be the kind of mother she was before she was admitted to Fairfax.

**I.    Fairfax Hospital staff practice indiscriminate cavity searching, strip searching, and video recording of patients in various states of undress.**

103.    Fairfax has a blanket policy requiring all patients to remove their clothing and a practice of randomly strip-searching patients indiscriminately. This process is video recorded by Fairfax in violation of the patient's privacy. Fairfax uses video cameras in the hall, the holding area outside the bathroom, and the room where the strip searches are conducted. Fairfax makes



and keeps these video recordings to protect itself from liability, and not for any legitimate medical reasons or out of concern and care for its patients' well-being.

104.     Not only do these practices violate the standard of care for a psychiatric hospital, they have no connection to any legitimate psychiatric purpose. By way of comparison, other hospitals have policies that significantly limit staff members' ability to conduct a strip search or a cavity-search. These policies set forth layers of measures before resorting to a strip search. For example, at Eastern State Hospital, a patient must "verbalize a suicidal or homicidal plan with covert or overt messages indicating *the means are on his/her person and refuses to give it to staff.*"[4] A body cavity search requires "credible report that a patient has concealed contraband in a body cavity (e.g. glass in vagina, illegal drugs in rectum)."[5] A physician must interview the patient in order to conduct a cavity search, and all viable alternatives to a cavity search, such as x-ray or the patient's voluntary removal of the object must be eliminated before conducting the search.[6] At Western State Hospital, a strip- or cavity-search may only be conducted where there is a "reasonable suspicion a patient possesses restricted items that constitute an <u>immediate</u> threat to life or safety."[7] Western State Hospital staff are required to conduct the least intrusive type of search necessary.[8]

105.     Other institutions require privacy safeguards for patients, including a requirement that the searches be conducted in a private room without a camera. At Eastern State Hospital, a strip search requires two staff members of the same sex be present, and that they conduct the search as quickly as possible so the patient is not unclothed any longer than is necessary.[9] A cavity search must be conducted by a physician and an RN of the same sex as the patient.[10]

---

[4] Contraband Search, Eastern State Hospital Man § 1.39, at 7 (effective June 1993, last reviewed May 2017) (emphasis added).

[5] Contraband Search, Eastern State Hospital Man § 1.39, at 8 (effective June 1993, last reviewed May 2017).

[6] Contraband Search, Eastern State Hospital Man. § 1.39, at 8 (effective June 1993, last reviewed May 2017).

[7] Searches, Western State Hospital, Policy 13.06(F) (issued March 2017) (emphasis in original).

[8] Searches, Western State Hospital, Policy 13.06(A) (issued March 2017).

[9] Contraband Search, Eastern State Hospital Man. § 1.39, at 7-8 (effective June 1993, last reviewed May 2017).

[10] Contraband Search, Eastern State Hospital Man. § 1.39, at 8 (effective June 1993, last reviewed May 2017).

SECOND AMENDED CLASS ACTION COMPLAINT - 18
Case No. 2:19-cv-00635-TSZ
003229-11/1271691 V1

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

106.     As yet another layer of protection for patients, other institutions require layers of oversight before a strip- or a cavity- search can be conducted. At Eastern Washington State Hospital, for instance, a physician must order a strip search. And the hospital's CEO or designee must authorize a cavity search.[11] At Western State Hospital, a written physician's order is required for either a strip- or a cavity-search.[12]

107.     Other institutions furthermore require documentation of the reasons, results, and persons involved in a search.[13]

108.     On information and belief, no psychiatric hospital in Washington State other than Fairfax permits its staff to arbitrarily conduct strip searches or cavity searches.

109.     On information and belief, no psychiatric hospital in Washington State other than Fairfax makes and keeps video recordings of patients in various states of undress.

**J.     Fairfax Hospital's invasive search and video monitoring practices are motivated by discriminatory animus.**

110.     Stigma about people suffering from mental illness is deeply embedded in social and cultural norms. Such stigma is a baseless, prejudicial attitude that discredits individuals suffering from mental illness, marking them as tainted and devalued.[14] Stigma results in discrimination in employment, housing, medical care, and social relationships. Public stigma reflects a larger social and cultural context of negative community-based attitudes, beliefs, and predispositions that shape informal, professional, and institutional responses.[15]

111.     Individuals with mental illness are subjected to prejudice and discrimination from others (i.e., received stigma), and they may internalize feelings of devaluation (i.e., self-stigma). On a societal level, this stigma has been implicated in low service use and inadequate funding for mental health research and treatment (i.e., institutional stigma).[16]

---

[11] Contraband Search, Eastern State Hospital Man. § 1.39, at 7-8 (effective June 1993, last reviewed May 2017).

[12] Searches, Western State Hospital, Policy 13.06(B)(1), (F) (issued March 2017).

[13] Searches, Western State Hospital, Policy 13.06(G) (issued March 2017); Contraband Search, Eastern State Hospital Man. § 1.39, at 3 (effective June 1993, last reviewed May 2017).

[14] Pescosolido, *et. al.*, *A Disease Like Any Other? A Decade of Change in Public Reaction to Schizophrenia, Depression, and Alcohol Dependence*, AM J PSYCHIATRY (2010), 167:1321-1330.

[15] *Id.*

[16] *Id.*



112.     Much of the stigma associated with mental illness results from conflating mental illness with violence. Sensational news reporting on violent crimes committed by people with mental illness, particularly mass shootings, perpetuates the stigma. These reports focus on mental illness, ignoring the fact that most of the violence in society is caused by people without mental illness. This societal bias contributes to the stigma faced by those with a psychiatric diagnosis, which leads to discrimination.[17]

113.     "Most people with mental illness are not violent toward others and most violence is not caused by mental illness, but you would never know that by looking at media coverage of incidents," says Emma E. McGinty, Ph.D., MS, an assistant professor in the departments of Health Policy and Management and Mental Health at the Bloomberg School. "Despite all of the work that has been done to reduce stigma associated with mental health issues, this portrayal of mental illness as closely linked with violence exacerbates a false perception about people with these illnesses, many of whom live healthy, productive lives."[18]

114.     Although mental health professionals hold more positive attitudes than the general public about people with mental health problems, strong stereotypes persist in both groups.[19] In a 2014 study of Washington State mental health professionals, many providers held negative attitudes about a hypothetical vignette character with symptoms of schizophrenia—nearly a third said it was likely that this individual would be violent toward others.[20] Yet study after study confirms that schizophrenia, major depression, or bipolar disorder alone do not predict violence.[21] A study from 1998, for example, followed patients released from psychiatric hospitals and found that they were no more prone to violence than other people in their

---

[17] *Id.*

[18] *Study: News Stories Often Link Violence With Mental Health Illness, Even Though People With Mental Health Illness Are Rarely Violent*, Johns Hopkins Bloomberg School of Public Health (2016), https://www.jhsph.edu/news/news-releases/2016/study-news-stories-often-link-violence-with-mental-health-llness-even-though-people-with-mental-health-illness-are-rarely-violent.html.

[19] Stuber JP, *Conceptions of Mental Illness: Attitudes of Mental Health Professionals and the General Public* (2014).

[20] *Id.*

[21] Elbogen, Johnson, *The Intricate Link Between Violence and Mental Disorder; Results From the National Epidemiologic Survey on Alcohol and Related Conditions*, ARCH GEN PSYCHIATRY (2009), 66(2):152-161.

HB   HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

communities unless they also had a substance abuse problem.[22] And a 2009 study analyzing the results of the National Epidemiologic Survey on Alcohol and Related Conditions confirmed that serious mental illness is not by itself a predictor of violence.[23]

115.    The biases and prejudices held by mental health treatment providers can have a significant negative impact on treatment outcomes and quality of life.[24] People with mental disorders engage with mental health professionals at a vulnerable time. Even a small number of professionals engaging in the denigration of people with mental illness or holding low expectations for improvement translates into negative treatment outcomes and a reluctance to seek mental health treatment in the future.[25]

116.    Even though studies have shown that up to one-third of mental health professionals in Washington State incorrectly associate serious mental illness with violence, Fairfax has failed to limit the operation of this bias against its patients. Fairfax does not restrict arbitrary searches and invasive monitoring. This allows the discriminatory animus of its staff against people with mental illness to go unchecked. Staff at Fairfax may indiscriminately strip search, cavity search, and video record patients without any justification, oversight, or documentation.

117.    Fairfax's practices—and its failure to limit the discretion of its staff—means that a substantial number of its mental health patients do not have reasonable access to inpatient care for mental health disorders.

118.    Fairfax could easily provide reasonable access to care for mental health patients by implementing the safeguards that other institutions already use: (1) a tiered approach that requires additional justification as searches become more invasive; (2) an oversight scheme that requires escalating approval as searches become more invasive; and (3) a requirement that the

---

[22] MacArthur Community Violence Study (2001), http://www.macarthur.virginia.edu/violence.html.

[23] Elbogen, Johnson, *The Intricate Link Between Violence and Mental Disorder; Results From the National Epidemiologic Survey on Alcohol and Related Conditions*, ARCH GEN PSYCHIATRY (2009), 66(2):152-161.

[24] Stuber JP, *Conceptions of Mental Illness: Attitudes of Mental Health Professionals and the General Public* (2014).

[25] *Id.*

H-B   HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

reasons, results, and persons involved in a search be documented. Fairfax can also easily restrict video monitoring to areas where patients are fully clothed, as do other institutions.

**K.    Fairfax Hospital's strip search and video monitoring practices have a disparate impact on survivors of trauma, including Plaintiffs.**

119.    Trauma is a near universal experience of individuals with behavioral health problems.[26] Approximately 90% of those seeking inpatient services are trauma survivors.[27]

120.    Retraumatization occurs when patients experience something that makes them feel as though they are undergoing another trauma, such as being involuntarily touched, forced, or held down.[28]

121.    All inpatient psychiatric patients are entitled to care, treatment, and therapies to maintain and improve their health and well-being. Most importantly for individuals with chronic mental illness, inpatient psychiatric patients are entitled to dignity, respect, compassion, and competent care.

122.    The practice of requiring psychiatric patients to strip can cause patients with a history of sexual abuse severe anxiety because it triggers memories of prior abuse.

123.    It is well recognized by mental health professionals that in the absence of an emergency, an individualized assessment should be made by a mental health professional before a strip search is conducted. It is also well recognized by mental health professionals that for some patients, requests or requirements that they strip and be searched can cause turmoil, extreme agitation, panic, and exacerbates existing psychiatric conditions including anxiety, depression, and post-traumatic stress disorder.

124.    Fairfax's pattern and practice of indiscriminately performing invasive searches of patients and excessive use of unnecessary video recording strip searches and throughout the

---

[26] *Trauma-Informed Care*, National Council for Behavioral Health (2019), https://www.thenationalcouncil.org/topics/trauma-informed-care/.

[27] Mueser, Essock, Haines, Wolfe & Xie, *Posttraumatic Stress Disorder, Supported Employment, and Outcomes in People with Severe Mental Illness*, US National Library of Medicine National Institute of Health (2004), https://www.ncbi.nlm.nih.gov/pubmed/15616477.

[28] *A Treatment Improvement Protocol: Trauma-Informed Care in Behavioral Health Services, TIP* 57, SAMHSA (2014), http//store.samhsa.gov/product/TIP-57-Trauma-Informed-Care-In-Behavioral-Health-Services/SMA14-4816.

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

hospital is negligent, violates the Vulnerable Adult statute and the Washington Law Against Discrimination, and invades patients' privacy causing severe emotional distress, physical harm, and economic harm to Plaintiffs and the Class, for which Fairfax must be held responsible.

## V.   CLASS ALLEGATIONS

125.   Plaintiffs Jane Doe, John Doe, and H.S. bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of themselves and the following Class:

> All persons who were admitted to Fairfax between April 30, 2016,
> and the date of class certification.

126.   The Class consists of hundreds, of individuals, if not more, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are ascertainable through records maintained by Fairfax.

127.   The claims of Plaintiffs Jane Doe, John Doe, and H.S. are typical of the Class. The claims of Plaintiffs Jane Doe, John Doe, H.S., and the Class are based on the same legal theories and arise from the same unlawful pattern and practice of strip searching patients without particularized suspicion and excessive use of video recording throughout the hospital.

128.   There are many questions of law and fact common to the claims of Plaintiffs Jane Doe, John Doe, H.S. and the Class, and those questions predominate over any questions that may affect only individual Class Members within the meaning of Fed. R. Civ. P. 23(a)(2) and (c)(4).

129.   Common questions of fact and law affecting members of the Class include, but are not limited to, the following:

> a.   Whether Fairfax employees fail to provide mental health treatment and deny reasonable accommodations to seriously mentally ill patients who require inpatient treatment by performing strip- and cavity-searches without justification, oversight or documentation.
>
> b.   Whether Fairfax's pattern and practice of performing invasive searches of patients without particularized suspicion violates the Americans with Disabilities Act;

SECOND AMENDED CLASS ACTION COMPLAINT - 23
Case No. 2:19-cv-00635-TSZ
003229-11/1271691 V1



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

c.     Whether Fairfax's pattern and practice of performing invasive searches of adult patients without particularized suspicion violates the Vulnerable Adult statute;

d.     Whether Fairfax's pattern and practice of performing invasive searches of patients without particularized suspicion violates the Washington Law Against Discrimination;

e.     Whether Fairfax's use of video cameras in the hall, the holding area outside the bathroom, and in the room where strip searches are being conducted invades patient privacy; and

f.     Whether Fairfax's practice of unjustified, unsupervised, and undocumented strip- and cavity-searches and practice of video recording patients denies those experiencing mental illness from receiving the treatment they present for and are entitled to receive.

130.    Absent a class action, most of the members of the Class would find the cost of litigating their claims to be prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

131.    Plaintiffs Jane Doe, John Doe, and H.S. will fairly and adequately represent and protect the interests of the Class. Plaintiffs Jane Doe, John Doe, and H.S. have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs Jane Doe, John Doe, and H.S. and their counsel are committed to vigorously prosecuting this action on behalf of the other respective Class Members, and have the financial resources to do so. Neither Plaintiffs Jane Doe, John Doe, and H.S. nor their counsel have any interests adverse to those of the other members of the Class.

SECOND AMENDED CLASS ACTION COMPLAINT - 24
Case No. 2:19-cv-00635-TSZ
003229-11/1271691 V1

HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

## VI.   CAUSES OF ACTION

### COUNT I

### TITLE III OF THE AMERICANS WITH DISABILITIES ACT

(By all Plaintiffs individually, and by Jane Doe, John Doe, and H.S. on behalf of the Class)

132.   Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs.

133.   The Americans with Disabilities Act ("ADA") was passed in 1990 to "provide a clear and comprehensive national mandate for the elimination of discrimination against people with disabilities." 42 U.S.C. § 12101(b)(1). Congress explicitly defined discrimination to include "over-protective rules and policies," "failure to make modifications to existing ... practices," and "segregation, and relegation to lesser services." 42 U.S.C. § 12101(a)(5).

134.   When Congress passed the ADA, it intended to "address the major areas of discrimination faced day to day by people with disabilities," 42 U.S.C. § 12101(b)(4), including in the area of "health services," 42 U.S.C. § 12101(a)(3).

135.   Fairfax is a "place of public accommodation" as that term is defined in Title III of the Americans with Disabilities Act. 42 U.S.C. § 12181(7)(F), 28 C.F.R. § 36.104. The ADA prohibits discrimination by a public accommodation against any individual on the basis of disability. 28 C.F.R. § 36.201(a).

136.   Plaintiffs and the Class suffer from serious mental health conditions that require inpatient treatment and impair their ability to request accommodations. They are members of a protected class of people with disabilities under the ADA.

137.   Title III of the ADA prohibits public accommodations from discriminating against individuals with disabilities in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodations. 42 U.S.C. § 12182(a). The definition of discrimination includes "failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the

nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii).

138.    Fairfax's practice of unjustified, unsupervised, and undocumented strip- and cavity-searches denies those experiencing mental illness from receiving the treatment they require and are entitled to receive. Fairfax's humiliating, unchecked search practices proximately resulted in negative treatment outcomes for Plaintiffs and the Class, as well as substantial mental and physical anguish. These practices are substantially motivated by discriminatory animus towards people with serious mental health conditions requiring inpatient treatment. These practices deliberately required Plaintiffs and the Class to endure unnecessary hardship in order to access a program or service. That hardship could easily be eliminated by a reasonable accommodation, such as the policies and practices implemented by other institutions set forth in paragraphs 51 through 54 and paragraph 65 of this Amended Complaint. Fairfax has thus failed to provide Plaintiffs and Class members with the reasonable accommodations required by the federal disability statutes, failing to ensure them meaningful access to the benefits to which they are entitled.

139.    Fairfax's practice of recording patients during strip- and cavity-searches restricts those experiencing mental illness from receiving the treatment they require and are entitled to receive. Fairfax's humiliating video recording practices proximately resulted in negative treatment outcomes for Plaintiffs and the Class, as well as substantial mental and physical anguish. This practice is substantially motivated by discriminatory animus towards people with serious mental health conditions requiring inpatient treatment. This practice deliberately required Plaintiffs and the Class to endure unnecessary hardship in order to access a program or service. That hardship could easily be eliminated by a reasonable accommodation, such as the policies and practices implemented by other institutions set forth in paragraphs 51 through 54 and paragraph 65 of this Amended Complaint. Fairfax has thus failed to provide Plaintiffs and Class members with the reasonable accommodations required by the federal disability statutes, failing to ensure them meaningful access to the benefits to which they are entitled.



# COUNT II

## ABUSE OF VULNERABLE ADULTS

(By Plaintiffs Jane Doe, John Doe, Jane Doe 2, John Doe 2, and N.B., Jane Doe 3, and Jane Doe 4 individually)

140.    Plaintiffs Jane Doe, John Doe, Jane Doe 2, John Doe 2, and N.B., Jane Doe 3, and Jane Doe 4 re-allege and incorporate by reference the allegations contained in the previous paragraphs.

141.    At all times, Fairfax was required to comply with the Vulnerable Adult statute at RCW 74.34, *et seq.*

142.    RCW 74.34.021 defines a "vulnerable adult" as "a person…admitted to any facility."

143.    Fairfax Behavioral Health is a "facility," as defined in RCW 74.34.020.

144.    Plaintiffs Jane Doe, John Doe, Jane Doe 2, John Doe 2, N.B., Jane Doe 3, and Jane Doe 4 and adult Class members are vulnerable adults as defined under RCW 74.34.020.

145.    Fairfax violated the Vulnerable Adult statute by, among other things, subjecting Plaintiffs Jane Doe, John Doe, Jane Doe 2, John Doe 2, N.B., Jane Doe 3, and Jane Doe 4 and adult Class members to abuse, mental abuse, and/or neglect as defined under RCW 74.34.020.

146.    As a direct and/or proximate result of Fairfax's actions and/or inactions, Plaintiffs Jane Doe, John Doe, Jane Doe 2, John Doe 2, N.B., Jane Doe 3, and Jane Doe 4 and adult Class members were damaged.

147.    In addition to other remedies available under the law, a vulnerable adult who has been subjected to abuse, mental abuse, and/or neglect either while residing in a facility shall have a cause of action for damages on account of his or her injuries, pain and suffering, and loss of property sustained thereby.

148.    As a result of Fairfax's acts and/or omissions described herein, Plaintiffs Jane Doe, John Doe, Jane Doe 2, John Doe 2, N.B., Jane Doe 3, and Jane Doe 4 and adult Class members shall be awarded his or her actual damages, together with the costs of the suit, including a reasonable attorneys' fee. The term "costs" includes, but is not limited to, the

HB HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  reasonable fees for a guardian, guardian ad litem, and experts, if any, that may be necessary to

2  the litigation of a claim brought under this section.

### COUNT III

### NEGLIGENCE

(By all Plaintiffs individually)

6  149.    Plaintiffs re-allege and incorporate by reference the allegations contained in the

7  previous paragraphs.

8  150.    By seeking psychiatric treatment from Fairfax, a special, confidential, and

9  fiduciary relationship between Plaintiffs and Fairfax was created, resulting in Fairfax owing

10 Plaintiffs a duty to use care to ensure their safety and freedom from assault, abuse, and

11 molestation while interacting with their employees, representatives, and/or agents.

12 151.    Fairfax had a duty to hire competent, qualified and experienced employees who

13 were knowledgeable and familiar with the proper standards of care of vulnerable adults.

14 152.    Fairfax had a duty to train and supervise their employees, agents and other

15 individuals hired by them to provide safe and proper care to vulnerable adults who were either

16 voluntarily admitted or involuntarily committed patients at Fairfax.

17 153.    Fairfax violated their duty of care and their duty to act reasonably by, among

18 other things, performing invasive searches of patients without particularized suspicion.

19 154.    Fairfax violated their duty of care and their duty to act reasonably by, among

20 other things, using video cameras outside the bathroom, where patients change and in the

21 seclusion room where invasive searches are conducted.

22 155.    Fairfax violated their duty of care by, among other things, failing to adequately

23 instruct, monitor, and supervise their employees and agents regarding what searches can be done

24 and with what protections.

25 156.    As a direct and/or proximate result of Fairfax's actions and/or inactions, Plaintiffs

26 and Class members were damaged.

27

28



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT IV**

**INVASION OF PRIVACY**

(By all Plaintiffs individually)

157.    Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs.

158.    Fairfax uses video cameras in the hall, the holding area outside the bathroom, and in the room where the strip searches are conducted.

159.    Although hospitals can have legitimate reasons to video record patients, Fairfax's practice violated the standard of care.

160.    Fairfax intentionally intruded upon Plaintiffs' and Class members' solitude, seclusion or private affairs and concerns by recording patients in the hallway, the holding area outside the bathroom, and in the room where strip searches are conducted. This intrusion is highly offensive to reasonable individuals, such as Plaintiffs and the Class members, and was totally unwarranted and unjustified constituting an invasion of privacy.

161.    As a direct and/or proximate result of Fairfax's actions and/or inactions, Plaintiffs and Class members were damaged.

**COUNT V**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

(By all Plaintiffs individually)

162.    Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs.

163.    Fairfax's extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiffs and Class members.

164.    Fairfax acted with intent or recklessness, knowing that the pattern and practice of indiscriminately strip-searching psychiatric patients, many of whom have been sexually and physically abused, would likely cause emotional distress. Additionally, Fairfax acted with intent or recklessness, knowing that the use of video cameras in the area outside the bathroom where

SECOND AMENDED CLASS ACTION COMPLAINT - 29
Case No. 2:19-cv-00635-TSZ
003229-11/1271691 V1



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  patients are required to undress and in the room where strip searches are conducted, would likely

2  cause emotional distress.

3       165.   Fairfax's conduct caused suffering for Plaintiffs and Class members at levels that

4  no reasonable person should have to endure.

5       166.   As a direct and/or proximate result of Fairfax's actions, Plaintiffs and Class

6  members were damaged.

7                              **COUNT VI**

8              **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

9                        (By all Plaintiffs individually)

10      167.   Plaintiffs re-allege and incorporate by reference the allegations contained in the

11  previous paragraphs.

12      168.   Fairfax's extreme and outrageous conduct caused severe emotional distress to

13  Plaintiffs and Class members.

14      169.   Fairfax knew that the pattern and practice of indiscriminately strip searching

15  psychiatric patients, many of whom have been sexually and physically abused, would likely

16  cause emotional distress. Additionally, Fairfax knows that the use of video cameras in the area

17  outside the bathroom where patients are required to undress and in the room where strip searches

18  are conducted, would likely cause emotional distress.

19      170.   Fairfax's conduct caused suffering for Plaintiffs and Class members at levels that

20  no reasonable person should have to endure.

21      171.   As a direct and/or proximate result of Fairfax's actions, Plaintiffs and Class

22  members were damaged.

23                             **COUNT VII**

24              **WASHINGTON LAW AGAINST DISCRIMINATION**

25    (By all Plaintiffs individually, and by Jane Doe, John Doe, and H.S. on behalf of the Class)

26      172.   Fairfax Behavioral Health is a place of public accommodation.

27

28

SECOND AMENDED CLASS ACTION COMPLAINT - 30
Case No. 2:19-cv-00635-TSZ
003229-11/1271691 V1



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

173.     Plaintiffs and the Class suffer from serious mental health conditions that require inpatient treatment. They are members of a protected class of people with disabilities related to the presence of a mental health disability.

174.     Under RCW 49.60.030(l)(b), the Washington Law Against Discrimination ("WLAD") secures the right to "full enjoyment" of any place of public accommodation, including the right to purchase any service or commodity sold by any place of public accommodation "without acts directly or indirectly causing persons of [a protected class] to be treated as not welcome, accepted, desired, or solicited." *See* RCW 49.60.040(14). Similarly, WLAD prohibits "any person or the person's agent or employee [from committing] an act which directly or indirectly results in any distinction, restriction, or discrimination" based on a person's membership in a protected class. RCW 49.60.

175.     The WLAD protects the customer's "full enjoyment" of the services and privileges offered in public accommodations. RCW 49.60.030(l)(b). WLAD's broad definition of "full enjoyment" extends beyond denial of service to include liability for mistreatment that makes a person feel "not welcome, accepted, desired, or solicited." RCW 49.60.040(14).

176.     WLAD makes it unlawful for "any person or the person's agent or employee to commit an act" of, among other things, discrimination in a place of public accommodation. RCW 49.60.215. This provision imposes direct liability on employers for the discriminatory conduct of their agents and employees.

177.     It is an unfair practice for a person in the operation of a place of public accommodation to fail or refuse to make reasonable accommodation to the known physical, sensory, or mental limitations of a person with a disability. WAC 162-26-080(1).

178.     Fairfax's practice of unjustified, unsupervised, and undocumented strip- and cavity-searches denies those experiencing mental illness from receiving the treatment they present for and are entitled to receive. Fairfax's humiliating, unchecked search practices proximately resulted in negative treatment outcomes for Plaintiffs and the Class, as well as substantial mental and physical anguish. These practices are substantially motivated by

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  discriminatory animus towards people with serious mental health conditions requiring inpatient
2  treatment.

3     179.    Fairfax's practice of recording patients during strip- and cavity-searches restricts
4  those experiencing mental illness from receiving the treatment they present for and are entitled to
5  receive. Fairfax's humiliating video recording practices proximately resulted in negative
6  treatment outcomes for Plaintiffs and the Class, as well as substantial mental and physical
7  anguish. This practice is substantially motivated by discriminatory animus towards people with
8  serious mental health conditions requiring inpatient treatment.

9                                          **PRAYER FOR RELIEF**

10     WHEREFORE, Plaintiffs Jane Doe, John Doe, and H.S. on behalf of all Class members,
11  pray that this Court:

12     A.    Certify the Class, name Plaintiffs Jane Doe, John Doe, and H.S. as representative
13  of the Class, and appoint their lawyers as Class Counsel for claims under the Title III of the
14  Americans With Disabilities Act and under the Washington Law Against Discrimination
15     WHEREFORE, Plaintiffs, individually and Plaintiffs Jane Doe, John Doe, and H.S. on behalf of
16  all Class members, pray that this Court:

17     B.    Enter judgment against Fairfax Behavior Health in favor of Plaintiffs and the
18  Class;

19     C.    Award Plaintiffs and Class members damages for pain and suffering, and
20  compensatory and punitive damages;

21     D.    Order injunctive relief including preliminary and permanent injunctions
22  restraining Fairfax from indiscriminately strip searching patients and/ or recording strip searches
23  and requiring Fairfax to create protocols for conducting searches that require an individualized
24  assessment of immediate danger to self or others;

25     E.    Order injunctive relief including preliminary and permanent injunctions
26  restraining Fairfax from recording patients during strip- and cavity-searches and in other areas
27  where patients undress and requiring Fairfax to create protocols controlling the use of video
28  recording and preservation of video recordings; and



F.      Award Plaintiffs their reasonable attorneys' fees and costs.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Dated: July 7, 2020                    Respectfully submitted,

                                       HAGENS BERMAN SOBOL SHAPIRO LLP

                                       By */s/ Steve W. Berman*
                                           Steve W. Berman, WSBA No. 12536
                                       */s/ Shelby R. Smith*
                                       Shelby R. Smith, WSBA No. 31377
                                       1301 Second Avenue, Suite 2000
                                       Seattle, WA 98101
                                       Telephone: (206) 623-7292
                                       Facsimile: (206) 623-0594
                                       steve@hbsslaw.com
                                       shelby@hbsslaw.com

                                       */s/ Todd H. Carlisle*
                                       Todd H. Carlisle, WSBA No. 52683
                                       */s/ Stacie* Siebrecht
                                       Stacie Siebrecht, WSBA No. 29992
                                       Disability Rights Washington
                                       315 Fifth Avenue South, Suite 850
                                       Seattle, WA 98104
                                       Telephone: (206) 324-1521
                                       alexap@dr-wa.org
                                       stacies@dr-wa.org

                                       *Attorneys for Plaintiffs*



1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on July 7, 2020, I electronically filed the foregoing with the United

3  States District Court for the Western District of Washington by using the CM/ECF system. I

4  certify that all participants in the case are registered CM/ECF users and that service will be

5  accomplished by the CM/ECF system.

6      DATED: July 7, 2020.                     Respectfully submitted,

7                                               HAGENS BERMAN SOBOL SHAPIRO LLP

8                                               */s/ Steve W. Berman*

9                                               Steve W. Berman

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT - 34
Case No. 2:19-cv-00635-TSZ
003229-11/1271691 V1

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594