UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JANE DOE, JOHN DOE, and H.S., by and
through his guardian, individually and on
behalf of all others similarly situated, and
JANE DOE 2, JOHN DOE 2, N.B., JANE
DOE 3, and JANE DOE 4, individually,

        Plaintiffs,

   v.

BHC FAIRFAX HOSPITAL, INC. d/b/a
FAIRFAX BEHAVIORAL HEALTH,

        Defendant.

C19-635 TSZ

ORDER

THIS MATTER comes before the Court on a motion to deny class certification and strike class allegations, docket nos. 18 and 20, brought by defendant BHC Fairfax Hospital, Inc., which does business as Fairfax Behavioral Health ("Fairfax"), and a motion for class certification, docket no. 35, brought by plaintiffs Jane Doe, John Doe, and H.S. (the "Putative Class Representatives").  Having reviewed all papers[1] filed in support of, and in opposition to, both motions, the Court enters the following order.

**<u>Background</u>**

Fairfax is a privately-owned entity that provides inpatient psychiatric services in Washington.  2d Am. Compl. at ¶ 17 (docket no. 62).  Fairfax operates three facilities:

---

[1] Fairfax's motion, docket no. 42, to strike the declaration of Amanda McGill, docket no. 38, is DENIED.  Although the declaration provides no expert opinion relevant to the claims for which the Putative Class Representatives seek to certify a class, the Court has read and considered it.

ORDER - 1

1   (i) a 157-bed hospital located in Kirkland; (ii) a 30-bed unit located within the Pacific

2   Campus of Providence Regional Medical Center in Everett; and (iii) a 34-bed unit

3   situated at EvergreenHealth Monroe, a public hospital.  *See id.* at ¶ 18.  Fairfax generates

4   most, if not all, of its revenue from inpatient care for persons who are either voluntarily

5   or involuntarily committed in connection with some form of mental illness.  2d Am.

6   Compl. at ¶¶ 17-19 (docket no. 62).

7          The Putative Class Representatives, Jane Doe, John Doe, and H.S., were admitted

8   to Fairfax's hospital in Kirkland[2] in March 2018, December 2018, and May 2017,

9   respectively.  *Id.* at ¶¶ 24, 39, & 47.  The Putative Class Representatives allege that,

10  during the intake process, each of them was subjected to a cavity and/or strip search,

11  which was video recorded, and that, as a result of the "humiliating invasion of privacy,"

12  each of them attempted suicide after release from Fairfax.[3]  *Id.* at ¶¶ 24-26, 36-37, 39-41,

13  45-46, 47-49, 53-54.  Although the Second Amended Complaint[4] contains seven causes

14  of action, only two of these claims are asserted on behalf of a class, namely violation of

15

16  [2] The Putative Class Representatives attempt to make class-wide claims with respect to Fairfax's
    facilities in Everett and Monroe, but none of them received services at either location, and the
17  two plaintiffs, namely John Doe 2 and Jane Doe 2, who were admitted to the units in Everett and
    Monroe, respectively, are not asserting claims on behalf of any class.  *See* 2d Am. Compl. at
18  ¶¶ 55, 67, & 125 (docket no. 62).

19  [3] This allegation in the operative pleading is contradicted in part by the deposition testimony of
    plaintiff John Doe, who denied having attempted suicide after discharge from Fairfax's Kirkland
20  facility.  *See* John Doe Dep. at 91:17-19, Ex. K to Neiman Decl. (docket no. 45-11).

21  [4] Plaintiffs were granted leave to file their Second Amended Complaint after the pending cross-
    motions relating to class certification had already been filed.  *See* Minute Order (docket no. 61).
22  The parties, however, have addressed in their briefing the proposed class definition set forth in
    the Second Amended Complaint, and the matter is ripe for the Court's consideration.  *See id.* at
23  ¶ 4.

ORDER - 2

Title III of the Americans with Disabilities Act ("ADA") and violation of the Washington

Law Against Discrimination ("WLAD"), *see id.* at Counts I & VII; the other five claims

are pleaded by various plaintiffs individually, *see id.* at Counts II-VI.[5]  With respect to

the ADA and WLAD claims, the following class definition has been proposed:

> All persons who were admitted to Fairfax[6] between April 30, 2016,[7] and
> the date of class certification.

*Id.* at ¶ 125.

The parties disagree concerning the contours of Fairfax's admission process.

According to Fairfax, new patients generally undergo a contraband search and a skin

assessment, but either procedure may be modified or omitted at the patient's request.

*See* Graham Dep. at 92:23-93:15, Ex. C to Neiman Decl. (docket no. 45-3); Graham

Rule 30(b)(6) Dep. at 38:10-16 & 45:11-23, Ex. D to Neiman Decl. (docket no. 45-4).

The Putative Class Representatives contend that "[n]ot searching a patient is not an

option," citing for support an undated PowerPoint slide prepared for a safety training.

*See* Supp. Resp. at 1 (docket no. 43) (citing Ex. A to Smith Decl. (docket no. 44-1 at 5)).

---

[5] All plaintiffs other than H.S. allege claims individually under RCW Chapter 74.34, which allows "vulnerable" adults to sue certain types of facilities for "abuse."  *See* RCW 74.34.200(1); *see also* RCW 74.34.020(2), (6), & (22) (defining "abuse," "facility," and "vulnerable adult"). In addition, all plaintiffs individually sue Fairfax for negligence, invasion of privacy, intentional infliction of emotional distress (outrage), and negligent infliction of emotional distress.

[6] For purposes of certifying a class, "Fairfax" is defined as BHC Fairfax Hospital Inc. d/b/a Fairfax Behavioral Health, *see* 2d Am. Compl. at 1:2-3 (docket no. 62), and no distinction has been drawn between the three sites operated by Fairfax.

[7] This commencement date for the proposed class period corresponds with the date that precedes by three years the filing of the original complaint in this action, *see* Compl. (docket no. 1) (filed April 30, 2019), and is intended to preclude any statute-of-limitations defense, *see* Supp. Resp. at 8 (docket no. 43) (acknowledging that the WLAD has a three-year limitations period).

ORDER - 3

1  Fairfax replies that, during discovery, "no one remembered seeing or using" the outdated

2  training materials on which the Putative Class Representatives rely.  <u>See</u> Supp. Reply at 1

3  (docket no. 48).

4          Fairfax's search for contraband, defined as items that might compromise patient

5  safety or privacy, begins with a scan, using a hand-held metal detector, while the patient

6  is clothed, and then entails a search of the patient's garments, after the patient, in a

7  private area, out of camera view, and without staff surveillance, has removed them and

8  dressed in a hospital gown.  <u>See</u> Fairfax Policy No. 1000.7, Ex. 4 to Berman Decl.

9  (docket no. 36-4).  While the clothing is being searched elsewhere, a skin assessment of

10  the patient may be conducted.  During a skin assessment, a nurse looks for wounds and

11  signs of infection.  <u>See</u> Fairfax Policy No. 1001.40, Ex. 3 to Berman Decl. (docket

12  no. 36-3).  The skin assessment is supposed to be performed in a private area, also out of

13  camera view, while the patient is wearing a gown that can be moved around to permit the

14  nurse to view only portions of the body in sequence.  <u>See</u> <u>id.</u>; <u>see also</u> Resp. at 4 (docket

15  no. 42) (citing deposition testimony).

16          Fairfax asserts that a patient's body is not ordinarily searched for contraband, and

17  that the Putative Class Representatives' experiences were atypical.  <u>See</u> Resp. at 4-5

18  (docket no. 42); <u>see also</u> Graham Dep. at 74:7-21 & 75:14-20, Ex. C to Neiman Decl.

19  (docket no. 45-3) (Fairfax's policy refers to a search of belongings, not of a patient's

20  body, and it does not envision that a patient will be totally naked during either a

21  contraband search or a skin assessment).  Indeed, Putative Class Representative Jane

22  Doe's own Patient Complaint and Grievance Report Form ("Grievance") supports

23

ORDER - 4

1    Fairfax's position that the way Jane Doe was allegedly treated was unusual.  *See* Ex. J to

2    Neiman Decl. (docket no. 45-10).  In her Grievance, Jane Doe indicated that she was told

3    to remove all of her clothes, except for her "very small panties," and to "squat down and

4    spread [her] vagina and behind."  *Id.* (docket no. 45-10 at 3).  In response to Jane Doe's

5    objections to these instructions, another staff member purportedly suggested that she pull

6    down her panties and "walk a few steps."  *Id.* (docket no. 45-10 at 4).  According to Jane

7    Doe, this process made her feel "violated" and caused her to sob and shake, and she

8    "complied out of sheer terror."  *Id.* (docket no. 45-10 at 3-4).  Jane Doe also reported,

9    however, that she spoke with four "other female patients," and that each of them said

10   they received two gowns, "one for the front and one for the back," so "all they had to do

11   was quickly flash their body."  *Id.* (docket no. 45-10 at 5).  Jane Doe further wrote that

12   "<u>NONE</u> [of them] were asked to squat and open their private parts."  *Id.* (emphasis in

13   original).  Thus, although Jane Doe's allegations, if proven,[8] might provide a basis for

14   her individual recovery in this action, albeit perhaps on a theory other than disparate

15   treatment, *see infra* note 14, they do not suggest that other Fairfax patients had similar

16   experiences or reveal a policy or practice of conducting cavity searches or requiring

17   patients to stand naked while their bodies are searched for contraband.[9]

18

_____

19   [8] Jane Doe's version of events is disputed.  According to Ghirmalem Haile, Jane Doe initially
     refused the skin assessment, which she was permitted to do, but she later consented after another
20   Fairfax staff member explained to her that she could go to the bathroom and change into a
     hospital gown before undergoing the procedure.  Haile Dep. at 25:12-26:1, 54:6-56:5, Ex. B to
21   Neiman Decl. (docket no. 45-2).

22   [9] The Putative Class Representatives cite to a Washington State Department of Health ("DOH")
     Statement of Deficiencies dated May 29, 2019, concerning Fairfax's Kirkland facility, Ex. 12 to
23   Berman Decl. (docket no. 36-12), as evidence of "systematic violations."  *See* Mot. at 5 (docket

During the period from January 1, 2015, to December 2, 2019, Fairfax admitted 25,350 patients,[10] all of whom were searched for contraband.  *See* Fairfax's Answer to Interrogatory No. 4, Ex. 2 to Berman Decl. (docket no. 36-2).  Fairfax's Answer to Interrogatory No. 4 does not indicate how these contraband searches were conducted.  The Putative Class Representatives have offered no estimate concerning the number of putative class members who underwent a contraband search of their clothing and/or a skin assessment,[11] as opposed to merely being scanned with a wand for metallic items of concern.

_____

no. 35).  The DOH Statement identified four areas of concern:  (i) privacy curtains, (ii) skin assessments, (iii) emergency care ("Code Blue") procedures, and (iv) emergency equipment and supplies.  *See* Ex. 12 to Berman Decl. (docket no. 36-12).  In July 2019, Fairfax proposed a Plan of Correction, *see* Ex. F to Neiman Decl. (docket no. 45-6 at 9-16), and in September 2019, Fairfax submit a Progress Report concerning its Plan of Correction, *see id.* (docket no. 45-6 at 17-21).  With regard to skin assessments, in the Progress Report, Fairfax indicated that it had (i) revised its policies to designate a specific area in each unit, in which no cameras are located, where skin assessments and contraband searches will be conducted, and (ii) retrained all nursing staff concerning the revised policies, including the requirements that two staff members should be present throughout a skin assessment, that skin assessments and contraband searches should be performed in the designated areas and not video recorded, and that patients should not be asked to squat or cough during a search for contraband.  *Id.* (docket no. 45-6 at 18-19).  In October 2019, DOH accepted Fairfax's attestation that the identified deficiencies had been corrected.  *See* Ex. G to Neiman Decl. (docket no. 45-7).  The Putative Class Representatives discount DOH's decision because the agency did not conduct an independent investigation to ensure that the deficiencies had actually been addressed.  *See* Reply at 4 (docket no. 49).  Having themselves relied on DOH's Statement of Deficiencies in seeking class certification, the Putative Class Representatives cannot simply ignore Fairfax's efforts to rectify the situation or DOH's recognition that Fairfax had come into compliance with applicable regulations.

[10] This figure does not distinguish between Fairfax's three facilities, *i.e.*, Everett, Kirkland, and Monroe, and it includes patients who were admitted before April 30, 2016, when the proposed class period commenced, and who would not qualify as members of the putative class.

[11] Although disrobing to permit a search of one's apparel might qualify as a "strip search," it does not alone constitute a "cavity search," and the Putative Class Representatives have not separately quantified the extent to which cavity searches have occurred or are occurring at any of Fairfax's facilities.

ORDER - 6

**Discussion**

**A.        Standard for Class Certification**

Federal Rule of Civil Procedure 23 operates as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." _Comcast Corp. v. Behrend_, 569 U.S. 27, 33 (2013) (quoting _Califano v. Yamasaki_, 442 U.S. 682, 700-01 (1979)).  To maintain a class action, a plaintiff must "affirmatively demonstrate" compliance with Rule 23.  _Id._ (quoting _Wal-Mart Stores, Inc. v. Dukes_, 564 U.S. 338, 350 (2011)).  The prerequisites of Rule 23 are not mere pleading standards, but rather are evidentiary thresholds.  _See Wal-Mart_, 564 U.S. at 350.  Thus, a plaintiff bears the burden of proving, not just simply alleging, that all four criteria of Rule 23(a) are satisfied, _see id._ at 350-51, namely that (1) the class is so numerous that joinder of all members is impracticable; (2) questions of law or fact common to the class exist; (3) the plaintiff's claims are typical of the claims of the class; and (4) the plaintiff will "fairly and adequately" protect the interests of the class, _see_ Fed. R. Civ. P. 23(a).  Fairfax contends that, in this case, commonality, typicality, and adequate representation have not been, and cannot be, shown.

Even if the Rule 23(a) criteria are met, a plaintiff seeking class certification must also establish, with evidentiary support, that the proposed class qualifies under at least one of the three provisions of Rule 23(b).  _See Comcast_, 569 U.S. at 33.  In this matter, the Putative Class Representatives rely on two different Rule 23(b) grounds.  First, they proceed under Rule 23(b)(2), which contemplates a class as to which the opposing party "has acted or refused to act on grounds that apply generally to the class, so that final

1  injunctive relief or corresponding declaratory relief is appropriate respecting the class as

2  a whole." Fed. R. Civ. P. 23(b)(2). Second, they seek to apply Rule 23(b)(3) in

3  combination with Rule 23(c)(4), which together envision a class as to which the Court

4  finds that "the questions of law or fact common to class members predominate over any

5  questions affecting only individual members," Fed. R. Civ. P. 23(b)(3), that "a class

6  action is superior to other available methods for fairly and efficiently adjudicating the

7  controversy," *id.*, and that maintaining  a class action "with respect to particular issues" is

8  "appropriate," Fed. R. Civ. P. 23(c)(4). The Putative Class Representatives ask that a

9  Rule 23(b)(2) class be certified as to both the WLAD and ADA claims, but their request

10  for a Rules 23(b)(3) and (c)(4) class is confined to just the WLAD claim.[12]

11  **B.**     **Rule 23(b)(2) - Injunctive or Declaratory Relief Class**

12         **1.**     **Commonality**

13         The Putative Class Representatives' first hurdle is to demonstrate that the claims

14  of all potential class members depend on "a common contention" of such nature as "is

15  capable of classwide resolution." *Wal-Mart*, 564 U.S. at 350. The test is whether the

16  determination of the truth or falsity of the common contention "will resolve an issue that

17  is central to the validity of each one of the claims in one stroke." *Id.* "What matters . . .

18  is not the raising of common 'questions' – even in droves – but, rather the capacity of a

19  class-wide proceeding to generate common *answers* apt to drive the resolution of the

20

21  _____

22  [12] The ADA does not authorize private actions for damages. *See Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862, 867 (9th Cir. 2014).

23

1  litigation." *Id.* (emphasis in original, quoting Richard A. Nagareda, *Class Certification in*

2  *the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)).

3      The Court must "probe behind the pleadings" and engage in a "rigorous analysis"

4  as to whether the prerequisites for a class action have been satisfied.  *Comcast*, 569 U.S.

5  at 33.  The Court's inquiry will necessarily "entail some overlap with the merits" of the

6  underlying claims because class certification considerations are generally "enmeshed" in

7  the factual and legal issues associated with the causes of action being pursued.  *Walmart*,

8  564 U.S. at 351; *see also* *Comcast*, 569 U.S. at 33-34.  In this case, the starting point for

9  analysis is a recitation of the elements of the claims as to which a Rule 23(b)(2) class is

10  sought.

11      **2.     The Washington Law Against Discrimination**

12      The WLAD prohibits discrimination "because of . . . the presence of any sensory,

13  mental, or physical disability" with respect to the "right to the full enjoyment of any of

14  the accommodations, advantages, facilities, or privileges of any place of public resort,

15  accommodation, assemblage, or amusement."  RCW 49.60.030(1)(b).  The Putative Class

16  Representatives acknowledge that, to present a prima facie case of public accommodation

17  discrimination under the WLAD, the putative class members must show (i) they have a

18  disability;[13] (ii) Fairfax is a public accommodation; (iii) Fairfax provided a level of

19  service to them that was not comparable to the treatment afforded to individuals without

20

21  _____

22  [13] Under the WLAD, the term "disability" means "the presence of a sensory, mental, or physical
    impairment" that "[i]s medically cognizable or diagnosable," "[e]xists as a record or history," or

23  "[i]s perceived to exist whether or not it exists in fact."  RCW 49.60.040(7)(a)(i)-(iii).

1    disabilities; and (iv) their disability was a substantial factor causing the discrimination.

2    *See* Mot. at 18 (docket no. 35) (citing *Miller v. Monroe Sch. Dist.*, 159 F. Supp. 3d 1238,

3    1250 (W.D. Wash. 2016), and *Wash. State Commc'n Access Project v. Regal Cinemas,*

4    *Inc.*, 173 Wn. App. 174, 187, 293 P.3d 413 (2013)).

5                    **3.    The Americans with Disabilities Act**

6            The ADA bars discrimination "on the basis of disability" in the "full and equal

7    enjoyment of the goods, services, facilities, privileges, advantages, or accommodations

8    of any place of public accommodation."  42 U.S.C. § 12182(a).  The ADA defines

9    discrimination as including the "failure to make reasonable modifications in policies,

10   practices, or procedures, when such modifications are necessary to afford such goods,

11   services, facilities, privileges, advantages, or accommodations to individuals with

12   disabilities, unless the entity can demonstrate that making such modifications would

13   fundamentally alter the nature of such goods, services, facilities, privileges, advantages,

14   or accommodations."  *Id.* at § 12182(b)(2)(A)(ii).  In contrast to their WLAD claim,

15   which asserts disparate treatment, the Putative Class Representatives' ADA claim alleges

16   a failure to accommodate.[14]  *See Dunlap v. Liberty Natural Prods., Inc.*, 878 F.3d 794,

17   798 (9th Cir. 2017) ("a failure-to-accommodate claim 'is analytically distinct from a

18   claim of disparate treatment or impact under the ADA'").  To prevail on their ADA

19

20   [14] Fairfax characterizes as "nonsensical" the Putative Class Representatives' discrimination
21   theory because Fairfax does not provide services to non-disabled individuals, and thus, could not
     have treated them more favorably than putative class members.  *See* Resp. at 16 (docket no. 42).
22   Fairfax's argument exposes a fundamental flaw in the disparate treatment claim brought pursuant
     to the WLAD, but it does not address whether liability might arise under the ADA for failure to
23   accommodate despite Fairfax having catered solely to persons with disabilities.

ORDER - 10

claim, the putative class members must prove that (i) they have a disability;[15] (ii) Fairfax

owns, leases, or operates a place of public accommodation; (iii) Fairfax employed a

discriminatory policy or practice; and (iv) Fairfax discriminated against them, based on

their disabilities, by failing to make a requested reasonable modification to its policy or

practice, which was necessary to accommodate their disabilities.  *See Karczewski v.*

*DCH Mission Valley LLC*, 862 F.3d 1006, 1010 (9th Cir. 2017) (quoting *Fortyune v. Am.*

*Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004)).

> **4.      The Allegedly Common Questions Are Unrelated
> to the WLAD and ADA Claims**

The Putative Class Representatives argue that the following questions establish the

requisite commonality:

- whether Fairfax owes a duty to protect its patients' privacy, provide care in a safe setting and protect patients from neglect and abuse, including mental abuse;

- whether Fairfax violated any such duty when [sic] by providing inadequate policies, practices, training, and supervision related to patient searches;

- whether by failing to have adequate policies, practices, training and supervision, Fairfax exposed patients with mental illness to the risk of enduring unnecessary hardship of strip- and cavity-searches in order to receive treatment; and

- whether Fairfax's use of video cameras in the hall, the holding area outside the bathroom, and in the room where strip searches are being conducted invades patient privacy.

Mot. at 13 (docket no. 35).  The Putative Class Representatives do not, however, explain

how these questions or their answers would relate in any way to the elements of the

---

[15] The ADA defines "disability" as (A) a physical or mental impairment that "substantially limits one or more major life activities," (B) having a record of such physical or mental impairment, or (C) being regarded as having such physical or mental impairment.  42 U.S.C. § 12102(1).

1   WLAD and ADA claims.  The claims as to which the Putative Class Representatives seek

2   to certify a Rule 23(b)(2) class do not require proof or rebuttal of any duty of care or its

3   breach, exposure to or risk of harm, or invasion of privacy.  Rather, for purposes of

4   Rule 23(b)(2), the key issue to be decided with respect to the WLAD and ADA claims is

5   whether Fairfax discriminated against any of its patients "because of" or "on the basis" of

6   disability.  The above-listed allegedly common questions are unconnected to this key

7   inquiry, are not "central to the validity" of the statutory claims, and will not produce

8   answers that are "apt to drive the resolution of the litigation."  _See_ _Wal-Mart_, 564 U.S. at

9   350.  The Court declines the Putative Class Representatives' invitation to overlook what

10  they must do to establish a violation of the WLAD and/or the ADA.  _See_ _Ellis v. Costco_

11  _Wholesale Corp._, 657 F.3d 970, 981 (9th Cir. 2011) ("[I]t is not correct to say a district

12  court _may_ consider the merits to the extent that they overlay with class certification

13  issues; rather, a district court _must_ consider the merits if they overlap with the Rule 23(a)

14  requirements." (emphasis in original)); _see also_ _Phillips v. Sheriff of Cook Cty._, 828 F.3d

15  541, 552 (7th Cir. 2016) (plaintiffs seeking to certify a class must "articulate at least one

16  common question that is central to the resolution of all of their claims").

17      **5.      The WLAD and the ADA Do Not Authorize Suit
                  for Quasi-Constitutional Torts**

18          In support of their request for certification pursuant to Rule 23(b)(2), the Putative

19  Class Representatives contend that, because Fairfax's policies and practices do not forbid

20  cavity and/or strip searches without reasonable suspicion, they create a risk of improper

21  searches.  The Putative Class Representatives have borrowed from Fourth Amendment

22  jurisprudence the concept of a particularized basis to search, and they are essentially

23

ORDER - 12

asserting a constitutional tort.  Fairfax, however, is a private, not a governmental, entity, and the Putative Class Representatives cite no authority for the proposition that Fairfax cannot, without articulating any individualized justification, search all who enter its facilities.  They also fail to explain how their quasi-constitutional tort theory is actionable under the WLAD and/or the ADA.

Even if the Putative Class Representatives could bring within the ambit of their WLAD and ADA claims a challenge to the constitutionality or validity of Fairfax's contraband search policy, their reliance on *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957 (9th Cir. 2019), and *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), is misplaced.  Both *B.K.* and *Parsons* involved claims of deliberate indifference, which were brought under the Fourteenth and Eighth Amendments, respectively.  *B.K.*, 922 F.3d at 968 (involving a substantive due process claim, which required proof of an objectively substantial risk of harm and the official's subjective awareness of the risk); *see Parsons*, 754 F.3d at 662, 676-77 (concerning challenges to health-care and isolation-unit policies and practices, which purportedly manifested the prison officials' deliberate indifference to a substantial risk of serious harm to inmates).  In each case, the government's alleged "apathy to unsafe conditions" was viewed as theoretically creating a risk of future harm that was common to all class members, without regard to whether any "tragic event" had actually occurred or, if so, in what manner.  *See Amador v. Baca*, 2014 WL 10044904 at *4 (C.D. Cal. Dec. 18, 2014).  The policies at issue were the "glue" that held together the putative classes because the policies either were or were not unconstitutional, and

1    therefore either did or did not give rise to liability, as to every member of the class.  _See_

2    _B.K._, 922 F.3d at 969; _Parsons_, 754 F.3d at 678.

3          This reasoning does not apply to unlawful searches, and in attempting to invoke it,

4    the Putative Class Representatives have tried to put the proverbial "square peg through a

5    round hole."  _See Amador_, 2014 WL 10044904 at *4.  As explained in _Amador_, the risk-

6    of-harm theory has "no place" in search-and-seizure jurisprudence because the manner in

7    which one person was searched or seized has no bearing on another person's rights.  _Id._ at

8    *4 & n.5; _see id._ at *4 ("[T]he Fourth Amendment admits no analogous considerations.

9    The focus is on each individual's search – the risk of harm derived from another's

10   asynchronous search does not fit into the analysis.").  The risk-of-harm analysis does not,

11   in this case, demonstrate the commonality required for class certification.

12          **6.      Numerosity, Typicality, and Adequate Representation**

13          Commonality is not the only Rule 23(a) prerequisite that has not been satisfied.

14   Although Fairfax has not suggested that the Putative Class Representatives failed to

15   prove numerosity, the Court earlier identified information that has not been quantified,

16   _see_, _e.g._, _supra_ note 11, and the Court is not persuaded that numerosity has been shown,

17   at least with respect to individuals allegedly subjected to cavity searches.  In addition, the

18   Putative Class Representatives have not demonstrated typicality.  They have defined the

19   proposed class broadly to include all individuals admitted to Fairfax facilities during the

20   class period, but as a result of the previously mentioned missing data and the lack of

21   commonality, the Court cannot conclude that the Putative Class Representatives' claims

22   and experiences, which relate to only one of Fairfax's three locations, are typical of those

23

1    of the putative class members.  Finally, in seeking to limit Fairfax's ability to perform

2    searches for dangerous materials, the Putative Class Representatives assert interests that

3    might be antagonistic to those of putative class members, whose safety might be best

4    served, whether they agree or not, by allowing Fairfax to continue disarming incoming

5    patients, and thus, the Putative Class Representatives have not met the standard for

6    adequate representation.  _See_ _Ellis_, 657 F.3d at 985.  For the foregoing reasons, the Court

7    declines to certify a Rule 23(b)(2) class as to the injunctive and declaratory relief sought

8    under the WLAD and the ADA.[16]  In light of this ruling, the Court need not and does not

9    address Fairfax's argument that the Putative Class Representatives lack standing to seek

10   an injunction.

11   **C.**      **Rules 23(b)(3) and (c)(4) - Particular Issues Class**

12           The "particular issues" as to which the Putative Class Representatives request

13   class certification are whether Fairfax's policies and practices (1) "have allowed invasive

14   cavity searches and strip searches of adult patients without particularized suspicion," and

15   (2) "have allowed use of video cameras to record cavity searches and strip searches," in

16   violation of putative class members' rights under the WLAD.  _See_ Mot. at 1 (docket

17   no. 35).  Because the Putative Class Representatives have not satisfied the criteria of

18   Rule 23(a), they are not entitled to certification of a "particular issues" class under

19   Rule 23(c)(4).  _See_ _Amador v. Baca_, 2016 WL 6804910 at *3 (C.D. Cal. July 27, 2016)

20

21   _____

22   [16] The Court further observes that a Rule 23(b)(2) class seems unnecessary because a resolution
     favorable to the individual plaintiffs in this matter would likely bind Fairfax in the future with
     regard to the manner in which it conducts contraband searches of newly admitted patients.

23

("the Ninth Circuit's approval of Rule 23(c)(4) classes does not obviate the need to meet the requirements of Rules 23(a) and (b)").

In addition, certification as to the proposed "particular issues" would not be "appropriate."  *See* Fed. R. Civ. P. 23(c)(4).  In framing the "particular issues" in terms of video-recorded cavity and/or strip searches that are "allowed," rather than "required" or "mandatory," the Putative Class Representatives tacitly concede that particularized grounds for conducting a cavity and/or strip search (and/or recording it) might absolve Fairfax of liability to specific individuals.[17]  *See Wal-Mart*, 564 U.S. at 355 (a policy "*allowing discretion*" is "just the opposite of a uniform . . . practice that would provide the commonality needed for a class action" (emphasis in original)).  Thus, even if the answers to the "particular issues" outlined above were favorable to the putative class, assessing how Fairfax's policies and practices were applied, whether Fairfax has liability to any of its tens of thousands of patients, and the existence, nature, and extent of any damages would still need to be performed on an individualized basis.  Thus, the Putative Class Representatives have not made the requisite showing that any common questions of law or fact would predominate over individual ones.  *See* Fed. R. Civ. P. 23(b)(3).  The

---

[17] The Putative Class Representatives describe the search policies of Eastern State Hospital and Western State Hospital, *see* Ex. 6 to Berman Decl. (docket no. 36-6), as "set[ting] the standard" for the type of guidance Fairfax should provide to its staff.  *See* Mot. at 3 (docket no. 35).  The Court notes, however, that the state hospitals are subject to different regulations than private facilities, *see*, *e.g.*, Wash. Dep't of Soc. & Health Servs. Policy 5.5 ("Searches Among People Committed to the State Hospitals Under RCW 10.77"), Ex. 7 to Berman Decl. (docket no. 36-7), and this evidence does not establish that Fairfax's policies and practices are deficient.  It does, however, constitute an acknowledgement by the Putative Class Representatives that, even under the policies they tout as model examples, a cavity and/or strip search may be performed when the situation warrants it.

1 Court concludes that, with respect to the "particular issues" identified, certifying a class

2 is neither a superior means of "fairly and efficiently adjudicating" this controversy, *id.*,

3 nor consistent with the standard set forth in Rule 23(c)(4).

4 **<u>Conclusion</u>**

5      For the foregoing reasons, the Court ORDERS:

6      (1)    The Putative Class Representatives' motion for class certification, docket

7 no. 35, is DENIED, and Fairfax's motion to deny class certification and strike the class

8 allegations, docket nos. 18 and 20, is GRANTED.

9      (2)    The class allegations set forth in Section V of the Second Amended

10 Complaint, docket no. 62, are STRICKEN.  Plaintiffs' individual claims remain in the

11 case.

12      (3)    The Clerk is directed to send a copy of this Order to all counsel of record.

13      IT IS SO ORDERED.

14      Dated this 10th day of August, 2020.

15

16

17                     Thomas S. Zilly
                    United States District Judge

18

19

20

21

22

23